Case is Moore v. Microsoft, 06151J. Case is Moore v. Microsoft, 06151J. Give me your arm. May it please the court, good morning. Your Honor, my name is Jason Kravitz with Nixon Peabody, and I represent Hank Spicone in this action in his capacity as trustee of the General Unsecured Creditors Liquidation Trust of At-Home Corporation, on behalf of and in the name of the At-Home Liquidating Trust of At-Home Corporation. With me in counsel table, Your Honor, is counsel for Jacqueline Crawford as trustee for the AHLC. That's Mr. Mark Davies. Your Honor, the district court granted Microsoft's motion for a summary judgment in this case. There was only one issue that precluded or prevented this case from proceeding to the jury, specifically the decision that Spicone failed to offer evidence sufficient to establish a genuine issue of material fact concerning whether smart tag functionality determines topics. The district court erred because it overlooked the record evidence, specifically substantial expert testimony from a qualified expert, never any dispute about the expert's qualifications, in which he opined that smart tag functionality does, in fact, literally determine topics for purposes of claims 2A. Mr. Kravitz, you're suggesting there's only one issue. I think there's two issues. There are two issues that we're going to be talking about today, Your Honor. Certainly, there's the issues that are the subject of my appeal, and then certainly the issue of Microsoft's process of understanding. What would you like to talk about the standing issues? I will talk about it right now, if Your Honor would prefer. Because unless you have standing, you really have to go sit down. I agree, Your Honor. I think I'm appropriately standing here because I think my client does have standing in this action, and I'm happy to flip my outline when we can talk about standing. I do want to reserve some time to come back to the issues that I started with with the court's indulgence. Microsoft, in its process appeal, does, in fact, claim that my client doesn't have standing to serve or to enforce the 647 pattern. Specifically, Microsoft claims that the transfer of rights in this very complicated— What do you think G owned after the joint plan of liquidation was approved? What was it that—you understand the initial—we're going to use G for your general creditors and so on. What do you think G owned with regard to the 647 pattern? I think G owned all the substantial rights incident to ownership. Specifically, G owned the exclusive right to enforce the 647 pattern. That's undisputed. The question, of course, is does it have that right without the commensurate or without the accompanying of additional rights? And I believe that it does, Your Honor. G is the beneficial owner— Could G manufacture the product that was described in the 647 pattern? G cannot manufacture the product, Your Honor. Could G license it? Yes, G can license it. There's a dispute. Let me back up for one moment. Under the state of the laws that's now before us, could G license it? G does not have the right to license independent of a settlement. That's my understanding, Your Honor. The district court has ruled on the appeal for the bankruptcy decision. The district court has ruled, and that is absolutely the law as it stands today, that A, rather than G, has the independent right to license the pattern. That's what Judge Patel said. By the way, is that case still sitting in the Ninth Circuit? Our records, the best we could find, was that it was briefed over a year ago. Has it been argued? It has not been argued, Your Honor, to my understanding. This court moves much more quickly than the Ninth Circuit, apparently. But that case is still pending, and there's absolutely the intention to pursue it. But however, Your Honor, two important things. I want to come back. You asked me, does G have the right to manufacture it? No one has the right to manufacture it. That's besides the point. The question is, what is it that G— I disagree, Your Honor. I think G was given a chosen action, along with a whole lot of other things incidentally, a whole lot of other rights incidentally. In fact, I'm not even sure G owns the chosen action. At the time of the joint plan of liquidation was approved, had any action been taken to enforce the 647 patent? At the time that the joint plan was approved by the bankruptcy court, had any action been taken? I'm afraid I don't know the answer to that question. The answer is no, because the suit wasn't filed until some time later, unless I misread the record, in which case G didn't even have a chosen action because there had never been a legal claim of any kind. So the most G owned was a potential chosen action, right? A potential claim against a possible infringer. Isn't that really where we were at the time the joint plan of liquidation was approved? I don't agree with that, Your Honor. I think my understanding of a chosen action is that it necessarily presumes that there's— it's not necessarily the right cause of action. It is causes of actions both that are real and potential. No, a potential chosen action is a co-aided class. Okay, fair enough, Your Honor. But let me address your point by getting back to the issue of what specifically G took possession of. What rights were transferred to G? That is the question. And in order to answer that question, we also have to consider what rights weren't transferred to G. So first we have to remember this is at-home corporation, no longer has anything. It's a defunct corporation. All of its assets are now somewhere else. As a result of the joint plan of liquidation— That's right. —which enacted for all practical purposes a settlement agreement. Yes, Your Honor. An emphasis on liquidation. We have three liquidation trusts that are designed to liquidate assets. They are prohibited by law from engaging in commerce. None of these patents has the right to make users sell under the 647 patent. So what does G have? G has the exclusive right to enforce against all parties except Cox, Comcast, and AT&T. G also has the exclusive right to decide who to investigate and who to sue for purposes of enforcing the 647 patent. That's hardly a patent. Let's think about what rights G doesn't have. A has legal title, undisputed. A has legal title. But it holds that title in trust for the benefit of the beneficiary. Why do we care what A has? We care what A has because the law of this court requires us to look at what was transferred and what was retained or what wasn't transferred. Well, the law of this court requires us to decide whether G, who is the plaintiff in this case, has standing to bring an infringement action against the defendant, an infringement action based on a patent, the 647 patent. And the statute says— Who does the statute say can bring infringement actions? Patentee. Patentee. Is G a patentee? G is not a patentee. G is a virtual patentee. And that's a well-established principle under the precedent of this court. If all substantial rights are transferred, you are in effect— That's called an assignee, not a virtual patentee. Well, fair enough, Your Honor. But I would suggest that it's Section 281 in which this construct has been discussed by the court, Your Honor. And whether we call it—we have four categories. We have a pure assignment, in which case there's no dispute. The right title and interest in the patent is assigned over, such as an inventor to a—assigns his rights under an employment agreement. Key inverters. Right. Then we have the virtual assignee, which is we're all substantial rights transferred to this person or entity. Then we have exclusive licensee, and then we have bare licensee. In this case, Your Honor, I think the facts are pretty compelling that we have a virtual assignee situation here. A owns legal title. You're referring to a case that deals with something called a virtual assignee. Is that what you called it? That is what I called it. A virtual assignee, which holds that a virtual assignee, even close to computers, that a virtual assignee is a proper plaintiff. Do we have a case that says that? I believe—Your Honor, there is a case out there. I can't tell you which one. I think it might be Vopel, where that phrase was actually used. Other phrases are can't amount to an assignee. Other phrases are defective assignee for purposes of this analysis. This is—and if there are all substantial rights in that entity, if all substantial rights incident to ownership were transferred, that party has standing. And what are the virtual rights incident to ownership of a patent? Okay. Well, there are two primary categories. One is the statutory grant, which is the right to preclude others from making, using, or selling. G has that? G has that. And? And the other one is the natural rights, which, of course, goes back to 150, 200 years of precedent, where we talk about the right to actually make, use, or sell your invention, one's invention. Those rights don't belong to anybody in this case because of the very peculiar circumstances that are confronting this court. Your Honor, none of the cases— So it's your view that we—I mean, this is not really patent law. I mean, that we should apply a different principle to standing here because of the different rights affected by the transitions and the whole bankruptcy proceeding? Your Honor, I don't think we need to apply—I think the standard still applies. It's the well-established standard that this court has addressed probably a dozen times. But— That's not what the trial court said. The trial court said, I can't get there under patent law, but I can get there under bankruptcy law. Yeah, the trial court did say that. And I think that there's some truth in that. I think the appropriate way to characterize that is, these are unusual circumstances. This court has never confronted—we've looked at all the cases, and Microsoft has looked at all the cases. This court has never confronted anything similar to this situation where you have three liquidating trusts, none of whom have the right by law to practice the invention. So that, in my view, Your Honor, it is reasonable to take that factor out of consideration because that right was not retained by anybody. But doesn't A have the right to license people? A has the right to license it, but it can't— No, it cannot, because it can't practice. It is, by law, prohibited under the trust. It's a liquidating trust, which is a defined— not only—the trust agreement itself says you cannot engage in business activity. Each of those three trusts— But it can license it to someone who will then make the invention. It could, except, Your Honor, it can't engage in business activity. So what purpose would it have for licensing that? It is against the law for it to do that. It also can't— But you said momentarily. I thought you just said it can license. Your Honor, it has the right, according to the district court, it has the right to license. It cannot exercise that right without breaching its prohibitions, its settlement agreement requirement. Well, that's a contract problem between A and the other parties to that settlement agreement. That's their problem, not ours. It is—Your Honor, I don't think you can separate the two. I don't think that you can separate the rights incident of ownership, the all-substantial rights analysis, from the fact that in this particular case, this peculiar case, we have circumstances where no one is allowed to do that. All A can do— You said Balfell to us. Didn't Balfell, in that case, not only did they have the right to sue, but they were, in fact, a licensee as well? That is correct, Your Honor. You're not a licensee. She's not a licensee, right? We're not licensed to make, use, or sell. So you clearly don't have the same bundle of rights as Balfell. No, Your Honor. I suggest we have rights beyond what they had in Balfell. Well, what rights do you have? Because you don't have the right to make, use, or sell. You don't have the right to license. You don't even have the right to sue everybody. You only have the right to sue everyone minus a subset of companies. That's correct, Your Honor. So it seems to me you have a much smaller bundle of rights. Actually, we have some very important rights. A, that holds the title to the 647 patent, can't sell the patent without my client's blessing. My client has an absolute veto over whether or not A can do anything with that patent. But that has nothing to do with your rights, because that's just a contract deal between G and A. Your Honor, respectfully, every transfer or assignment situation at some level deals with a contract. Usually, it's in the context of a license agreement. Here, it's in the context of a bankruptcy settlement agreement, as you characterized, I think, active. So there's always a contract issue at play in this analysis. And if we get back to the principle of, were all substantial rights of ownership given to G, and by virtue of that, we have to look at what was retained, what was not given to G. A can't transfer this patent to anybody without my client saying that's okay. A can't do anything to impair the value of this patent. A can't do anything except give reasonable cooperation to my client in my client's efforts to enforce the patent. You do agree that A owns the patent? A owns the legal title to the patent. My client is the beneficiary of it. When A sells it, when the patent is determined no longer to have any value or it is determined that it is right for sale, my client gets 45 percent of the proceeds, and the other trust, the bondholders' trust, gets 55 percent. It just seems to me, Counsel, it just seems to me, Counsel, this case is a lot more like our probate decision. And in probate, they held a lot more of the rights than your client does here. And you still ultimately ruled they didn't have standing to bring suit. So in that case, there's even a quote, it has long been held that a right to sue clause in a contract on a company by the transfer of other instances of ownership does not constitute an assignment of patent rights that entitles the transfer to sue in its own name. And there's just a long, laundry list of cases which all support that proposition. So how do you distinguish yourself from the probate decision? Your Honor, I'm into my rebuttal time, but obviously this is critical stuff. Your Honor, probate, I've read the case a number of times, they do not have, in my opinion, they do not have as many rights of ownership as for transfer to my client in this case. In probate, it was unclear, this is specifically discussed in the Court's opinion, it was unclear whether probate had the right to make use or sell under the agreement in that case. So in our situation, that's analogous to our situation, it's not directly parallel. But in the probate case, very importantly, they say that when all else fails, we have to go back to the crown die stand, because I think they recognize that probate... But in probate, they did have the authority to license, right? I believe that's correct, Your Honor. In this case, in our case, no one, A, technically has the right to license, but they can't use it, right? And in probate, they had the right to veto assignments of the patent, just like that right that you touted to me a minute ago as a very important one that you said your client had. Well, probate had that too. They had the right to license, which you don't have. They had the right to bring all lawsuits, and yet we still held no standing. Yes, Your Honor. What do you have that they don't? We have, we are beneficial owners of this trust. Probate was not a beneficial owner of the patent. They have the right to 100% of the proceeds from all licensing and lease. How does that not make them a beneficial owner in that regard? They are not. We are beneficial owners pursuant to a trust, Your Honor. A is holding this patent for me, for my client. But you only get 100% of the money that you're bringing from the lawsuits. You only get 55%. No, Your Honor. You get 45. You're a minority holder. Your Honor, I'm out of time, but if I could just answer your question. We get 100% of the money of any recovery from the lawsuits that we bring. But, Mr. Cuff, can I, I don't want to answer your question, answer for you for Judge Moore's question, but it seems to me that in PROPAT, the court also referenced the fact that important factors were that they had to, PROPAT had to get consent to select its targets in suing. Do you have that requirement? We have absolute discretion as to who to investigate and who to sue. And PROPAT also, the court mentioned that the agreement requires PROPAT to use reasonable efforts consistent with business, business practices in its enforcement efforts and its licensing. Do you have a requirement that you have to use reasonable efforts? I don't believe we have that. For business practices. I don't believe we have that requirement, Your Honor, no. I think it is purely within our discretion as to who to investigate and who to sue. Well, why don't you, we'll restore your rebuttal time whenever you're sit down and we'll listen to Mr. Sherman. Thank you very much. Thank you. Good morning, Your Honors. Frank Sherman, Dr. Bishop Richardson with my colleague, Charles Sanders, here on behalf of Microsoft. May it please the court. I intend only to address the standing issues with this. Well, in light of that, and I appreciate that. Is AFM sufficient to bring suit in this case? Well, not the way they have the rights presently divided, no. In fact, that's one of our fundamental points is they've made such a mess of things. There is no single target today who can enforce this patent. Well, what about, okay, so the answer to A alone is no. What about A plus G? Well, if they try again and change in a substantial way the rights that G has. No, no, no, I'm talking about on the current. The answer is no. The answer is no. So, in other words, you're saying that this contractual, this division that occurred in connection with bankruptcy has essentially meant that the patent is now a void, that no one can enforce the patent. As of today, the answer to that question is yes. Excuse me, why did you answer Judge Post's question about A and G? Why did you say no? Well, because A and G today should get together and say, oh, good, let's go after Microsoft. Why wouldn't that work? Because of two reasons. A has no right to sue. But G does. G has the chosen action. There's no question about that. A has the title. There's no question about that. You put the title together with the owner of the chosen action, i.e., the right to enforce the title, it seems to me you've got a hole. Well, you don't. With a W, not an H. I think it's with an H, and I'll tell you why. Tell me why. Because the entire point of this Court's precedent on the standing issue is that you can only put an A and a G together if G has a certain bundle of rights. It's not enough to say... The only sort of non-owner that can join a patent owner in a lawsuit is an exclusive licensee. No, this is not a problem of the license. There's no licensee in this case. Right, so we're not in that body of law. We're in a different body of law. We're back to basics. The basic rule is a patentee who owns all of the rights to the patent, including the right to manufacture the product and exclude others, and to sue for all those things, that individual or that entity can sue. What we have here is a strange arrangement in which, for whatever business reasons they had in mind, they split that up. A has a piece of it, G has the other piece. Why can't they put those pieces back together and say, aha, we now have a claim? Why wouldn't that work? They can't do it given the way that the rights are presently apportioned. There might be a way, in fact, we make this clear in our papers, where if they go back and reapportion the rights so that A has standing and G could join if it were an agent, if we're given the rights to direct the litigation, if we're given the rights to recover the proceeds of litigation, that would work. But you can't say, G has no standing. It doesn't matter that they have the right to sue, the contractual right to sue. The Supreme Court has said this since Crown died. This Court has said it in an unbroken line of cases. I'm giving you that for purposes of the argument, but I still don't understand. I thought you might have answered, the reason A and G together can't work is because there was a private deal between A and Microsoft at some point back in time, which is only referenced in passing in the judge's opinion, in which A waived any suits against Microsoft. But interestingly, you never mention that in your brief. Why are you staying away from that? Is there something in there that we need to know about? No. Is there something in there you don't want us to know about? No. We asked the district court to decide that issue actually twice. Which issue? The release issue. That's the issue you're referring to. Back a minute. Microsoft was a large predator of A in the bankruptcy. Microsoft had claims against A. As a result, or to settle those claims, A released Microsoft. We think that that removes any cause of action against Microsoft in this pattern. But nowhere in your briefing to us do you even mention that. Because it was not passed on by the district court, and the district court felt that she didn't have to get there because she found that, and this actually gets to the standing issue, the district court found that G is standing on its own. No part of G's standing is derived from A, or they're not suing on behalf of A, they're not suing in the name of A. The basis for the district court's decision was that G alone is enough. Counsel, I like talking about this because it's an interesting issue, and certainly I haven't seen any of our cases where the result is nobody has the right to sue. Is there any case that you can point me to that I'm missing? In PROPAT it was between two people, but it didn't end up that no one had the right to sue. It was the patentee who retained the right to sue. In PROPAT it was whether the exclusive licensee or the patentee were the two. I've never seen a case where our ultimate decision on standing resulted in no one having the right to sue. I actually think that the answer to that is there are such cases. I can say SICOM, Judge Prost is familiar with that case. Really, almost all the standing cases, that's the result, because this court is passing on the arrangement that's before you today. Does this arrangement work? Does it confer standing? And in many, many cases this court has said no, it doesn't. Now, the opinions don't go on to say, and therefore, as of today, nobody can sue on that patent. But that is absolutely the result of the court's standing decisions. I couldn't find any other cases that raise this in the context of a bankruptcy whack-up, or whatever you want to call it, the way they did this. Do you have any other cases which raises this question? Assuming, and it seems, well, let's assume for the moment that under patent law they have no standing. The trial judge said, oh, but they do under bankruptcy law, because that's a different set of issues. Why shouldn't we go there? Because this is a patent case. Yeah, it's a patent case in a bankruptcy context. Why shouldn't we write, we have two rules now. One is the patentee can sue. Two is the exclusive licensee who joins the patentee, nominally at least, can sue. Why shouldn't there be a third category that says a holder of a chosen action with the agreement, and I assume Ed would agree to this, that with the agreement of the holder of the title in a bankruptcy context can also sue? Why would that work? The answer to your question is because Congress didn't say so, right? All patent rights are statutory. The standing requirements are statutory. The Supreme Court, again, has said over and over, you look at Crown Dye, it's all about the statute. I think this case is actually just like Crown Dye, where an owner says, there's a class of parties out there that I'd like you to go sue. Go get them, and that's the only way to get out. But in Crown Dye, I mean, I know what Propat said about Crown Dye, but if you read Crown Dye, I read it as saying in several portions, it seems to be only about whether or not the person with the right to sue can come in by himself. It seems to me the court doesn't suggest that he could bring someone else in explicitly, but it seems to me the Supreme Court was not deciding whether or not he could bring him in, and that would be satisfactory. The court continuously refers to the fact he himself, in other words, in this case, G himself could not go. But I think we've been talking here about not G himself, either A plus G or A alone. And so why do you think that Crown necessarily disposes of that issue? Well, because the plaintiff in Crown Dye, Nye, tried to argue that he could do inequity. He had the equitable right. By himself. And then deciding whether he by himself could proceed. And the court said a few times, he alone cannot. Where are you reading in Crown Tool that it decided the issue about whether or not, if the other person is in the case? So this gets back to Judge Plater's question. I think it follows from the reasoning of Crown Dye, because the opinion proceeds from the basis that rights are statutory. Paper rights are statutory. Rights to standing are statutory. Well, let me ask you about that one. I'm sorry to interrupt you, but I want to make sure I understand. In Waterman, which is one of the cases, I'm sure, the Supreme Court cases that preceded all of this, there's a statement at page three, which is, inequity as in law, when the transfer amounts to a license only, the title remains with the owner of the patent, and the suit may be brought in his name and never the name of the licensee alone, unless that is necessary to prevent an absolute failure of justice, as where the patentee is the infringer and cannot sue himself. Why couldn't we, in this case, say, yeah, you're right, but the upshot of what you're saying, if we agree with you, is, as Judge Moore pointed out, no one has the right to enforce the patent. Why couldn't we apply the absolute failure of justice in this context? Because there is no absolute failure of justice. That statement in Waterman was getting at the situation where no one could enforce the patent, ever. In this case, maybe somebody can enforce this patent if they go back and they do their homework and they fix it. There's no reason to believe that's going to happen because these trusts, I mean, this is a divorce, right? And on this issue, I suppose we're a divorce court here. Counsel, do we need to decide this issue? No. I find it interestingly academic, but academic nonetheless. I mean, A&G did not join to bring suit against Microsoft. The district court did not rule whether A&G together had standing. I mean, while it would make for a more interesting case, it's not the one before us, is it? It is not the one before you. But wait a minute, on that point, A is in the case. Isn't that, under our case law, sufficient? I mean, they're there, they're there as part of the contemplate. Why does that not mean that A is there and we can decide A's standing in this context? And if A has standing, we're done and they don't have to bring them back, right? I mean, our case law supports that. Your case law does support that, but again, this is the argument based on evidence. The evidence states that, right. And it's a different situation. Can you cure a standing problem by bringing the patent owner in later? The patent owner is here. The patent owner is here and we brought him in by counterclaim. So why is that not true if we assume that A's being there is sufficient? Because G has no standing. But wait a minute. What Judge Prost is saying is if A and G have standing, they're both now before us. We can't keep saying G has no standing. We know G, or at least we're getting the impression from you at least, that G has no standing. But the question Judge Prost is trying to get you to address is, is it not the case that by bringing A in, in your counterclaim, you have now presented us with the issue of whether A and G together have standing to bring this patent infringement suit? Have we presented the issue? Yes. The answer to the issue is it still doesn't solve the problem because G, under any view of the world, alone with A, does not have standing to participate. Does A, along with G, have standing to bring the suit? Do they have standing? Does A, along with G, have standing? A would have constitutional standing because they own the patent and they suffer an injury in fact if Microsoft indeed is infringing it. Yes. But they don't belong in court. That's the first part of the answer. They still wouldn't have... Why don't they belong in court? Because they gave away their right to sue. They have no right to sue today. They've given that away exclusively. Can they bring G in? Why can't A bring G in? Because G doesn't have any proprietary rights to the patent. So you seem to think we should analogize in between. There's a patentee that owns everything and then say there's some private attorney general type person who wants to bring a litigation to enforce that patent because the patentee hasn't been. So you want us to think of G as the person who owns nothing at all and therefore clearly have no standing to be involved in the lawsuit. That's kind of what you're trying to say. Right. And this is not... But G doesn't own nothing at all. Actually, they do own nothing at all. They own nothing. They have a chosen action as of the time that the actual case was brought. I have a little problem with what they owned at the time that the joint plan was approved because at that point there was no chosen action. There was only an inchoate possibility of the right to work. And I don't know how that could ripen at that point at least under the good old common law. But maybe things have changed by this century. I haven't, but maybe the law has. But putting that whole issue aside, G does have something. An unliquidated legal claim. That's what they own. And that is not... When you're talking about standing, which is statutory and constitutional actually at some level, owning an unliquidated legal claim is irrelevant. It is irrelevant. They cannot participate at all unless they own proprietary rights in the patent. That means legal title or enough of the legal title and the incidence of legal title that they are in effect the legal title owner. Is the assignment a valid assignment under Crown Rule? Did A have the right to assign the right to sue as it did to G? Valid in the sense that did A have that right to give away? Yes, A had that right to give away. It's not valid in a standing sense because it doesn't... Giving just that right away, which is all that G has, that doesn't confer standing on G. Why don't we restore some of your rebuttal time, if you need it, and I will return to Mr. Kravitz. Thank you. Mr. Kravitz. Mr. Kravitz. If you have two minutes, then you can make some more of your statement. I love the curl-dye case because it uses the phrase chosen after, which you so rarely hear these days. Let me read to you a sentence that seems to me to tee up this problem, at least from our perspective. It is said that the claim of an owner of a patent for damages for infringement is only a chosen action, which in modern days may be so assigned that the assignee acquires full title and the right to sue at law, as well as in equity, without joining his asset. This view ignores the peculiar character of patent property and the recognized rules for the transfer of its ownership and its incidence. Patent property is the creature of statute law, and its incidents are equally so, and depend upon the construction to be given to the statutes creating it and them in view of the policy of Congress in their enactment. The trial judge didn't believe that. The trial judge says, no, in this case the rights of G are defined by bankruptcy law. Assuming we believe curl-dye, aren't you sort of stuck with the patent law problem? And are you trying to tell us that G is standing on its own under patent law? I just want to be sure I understand exactly where you're coming from. Sure. Your Honor, I'm going to address your question directly, but first I want to say I don't think you can separate bankruptcy law and patent law in this case because they're going hand-in-hand down this road. I think that's your best argument, so go ahead. I'm off to a good start. Maybe I ought to sit down. But, Your Honor, let me just address chosen action very briefly. Your Honor, I don't pretend to be an expert in property, but if Microsoft, for purposes of discussion here today, if Microsoft was infringing as of the time that that plan was enacted, I think that's a chosen action. I don't think it's an inchoate right or a liquidated right. Putting that aside, to address your question more directly, curl-dye governs this case for purposes of whether they're standing in the patent context. No question about it. We have to look at that and answer that question in the context of how this peculiar arrangement came to be through the establishment and the formation of these liquidated trusts that have very limited abilities to do anything. Crown-dye says something, and this Court has interpreted crown-dye on a number of occasions in the context of standing most recently in pro-pat. What crown-dye says is it's not about legal title, it's about proprietary rights in the patent. There is absolutely no question, Your Honor, that Gee has proprietary rights in this patent. We are a beneficiary of the trust that holds it. That is not insignificant. And beneficiaries have beneficial interests in the property, in the corpus of the trust. We are beneficial owners of it. And no case that we could find deals with that issue. And it is not one that we can, that I respectfully suggest, can just dismiss lightly. That is a proprietary interest in the patent. And it goes, so for Mr. Scherkenbach to suggest that we have no proprietary rights, I don't think that's true, Your Honor. I think that's factually incorrect. We absolutely have a proprietary interest in this patent. We also have rights that go beyond the mere beneficial ownership. We have the right to control what happens with this patent. That is significant. It cannot be transferred without our blessing. That's very significant. Your Honor. Your use of the phrase proprietary interest, of course, comes out of, or at least is supported in private tech. That's where you're getting that particular idea from. Among others. Private tech says standing to sue for infringement depends entirely on the putative plaintiff's proprietary interest in the patent. You're making the argument that somewhere in the arrangement that he has is something called a proprietary interest. Well, I don't think it's as subtle as you're suggesting, Your Honor. I think by virtue of being a beneficiary of this trust, the trust that holds the patent, we have proprietary rights. I think that's a matter of established trust law. I mean, it's also a matter of the law. There's a decision from the CCPA, this Court's predecessor, that doesn't deal squirrelly with the issues that we're talking about today. But clearly, this issue of trusts owning patents and beneficiaries of trusts owning patents, those are ownership interests.  And we can't just, I don't think we can just ignore that. It's a significant factor. Okay. Thank you, Your Honor. Thank you, Your Honor. Mr. Sherman. Very briefly. For two minutes. Thank you, Your Honor. On this question of proprietary, that, the label is meaningless. The question is, what rights does G hold? Proprietary means legal title. It means some portion of legal title. And, Judge Plater, I'm glad to talk about Crown Dive. If you can look any number of places in Crown Dive where the Court says over and over and over again, the plaintiff must have legal title to the patent. Legal title to the patent because that's what the statute says. And this derives from the statute. One other point. On this question of, are we contending for a world where no one can enforce this patent? The answer is no. There might be a world where somebody can enforce this patent. If they had done it right initially, we wouldn't have this argument. If maybe they can fix it in the future and in the release issue, it doesn't otherwise end the case and they can get past the merits, which they also lost by the way. And doing it right again is just briefly... Well, they have to rearrange the rights between these trusts or create another trust that holds sufficient rights in the patent that they have standing. You know, the rules are clear. The Court has said, in fact, you look at PROPAT, you look at the Court's recent cases on standing and you keep saying, we've been over this and over it and over it and why can't you guys get it right? If they rearrange the rights correctly, you won't come back up here and argue that they did it wrong again. Well, if they do it right, well, I'll make a deal with you. That's right. But then I'll be up here arguing that they lost the merits. Right. But again, this is not the first and only case to involve bankruptcy. Right? This is not the first and only case to involve a trust that owns a patent. There's lots of them out there. And they do it right and the standing issue doesn't come up. These guys couldn't get it right because it's a divorce and they couldn't get a law and I don't know why. But, you know, don't, not that you would, but let's not make new law to deal with the situation they create. Thank you very much. Thank you.